**In the Matter of the Petition for Naturalization of Brenda Barbara WEITZMAN.**

**No. 19446.**

United States Court of Appeals, Eighth Circuit.

April 7, 1970.

Thomas C. Kayser, of Robins, Davis & Lyons, St. Paul, Minn., for appellant.

Paul Nejelski, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before BLACKMUN, LAY and HEANEY, Circuit Judges.

PER CURIAM.

The three of us who heard this appeal have, it turns out, separate and distinct approaches. Two (Judges Blackmun and Heaney) conclude that the constitutional issue is to be reached. One (Judge Lay) concludes that it need not be reached. The two who reach the constitutional issue find themselves apart in the resolution of that issue. Accordingly, Judges Lay and Heaney, for differing reasons, vote to reverse the district court's denial of the applicant's petition for naturalization and Judge Blackmun votes to affirm that denial. The trial court is thus reversed by a divided vote. Our separate opinions are appended.

BLACKMUN, Circuit Judge.

For me, the issue before us is narrow and specific. Is it constitutionally offensive to deny naturalization to an alien solely because her conscientious objection, within the language of the applicable statute, is concededly based on nothing other than "a merely personal moral code" and arises not at all "by reason

of religious training and belief"? We are advised that the case is one of first impression at the appellate level.

Brenda Barbara Weitzman, nee Aronowitz, now age 27, appeals from the district court's denial of her petition for citizenship. In re Weitzman, 284 F. Supp. 514 (D.Minn.1968). The appeal purports to rest solely on the asserted unconstitutionality, and not on any possible construction, of § 337(a) of the Immigration and Nationality Act of June 27, 1952, 8 U.S.C. § 1448(a).[1] On her appeal Mrs. Weitzman specifically abandons her additional argument, advanced in the trial court, that her opposition to the bearing of arms was "by reason of religious training and belief", as that phrase is employed in § 337(a) and as it was construed in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), in the somewhat different setting of a criminal proceeding under § 6(j) of the Universal Military Training

and Service Act, 50 U.S.C. App. § 456(j) (1958 ed.). The applicant's appellate brief states flatly that she has requested her counsel to appeal only the constitutional issue and that now "She agrees with that portion of the [district court's] decision finding that she is not a religious person." [2]

*The naturalization papers.* Mrs. Weitzman's petition for naturalization was filed in the District of Minnesota on October 31, 1966. It recited: She was born May 14, 1942, in South Africa and was a citizen of that country. She was married in Tel Aviv, Israel, on February 12, 1962, to Ronald Weitzman, who was born in the United States. She lawfully entered this country at New York City on June 12, 1963, for permanent residence. She was "attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States." She was "willing, if required by law, to bear

1. "§ 1448. Oath of renunciation and allegiance

(a) A person who has petitioned for naturalization shall in order to be and before being admitted to citizenship, take in open court an oath (1) to support the Constitution of the United States; (2) to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen; (3) to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic; (4) to bear true faith and allegiance to the same; and (5) (A) to bear arms on behalf of the United States when required by the law, or (B) to perform noncombatant service in the Armed Forces of the United States when required by the law, or (C) to perform work of national importance under civilian direction when required by the law. Any such person shall be required to take an oath containing the substance of clauses (1)–(5) of the preceding sentence, except that a person who shows by clear and convincing evidence to the satisfaction of the naturalization court that he is opposed to the bearing of arms in the Armed Forces of the United States by reason of religious training and belief shall be required to take an oath containing the substance of clauses (1)–(4) and

clauses (5) (B) and (5) (C) of this subsection, and a person who shows by clear and convincing evidence to the satisfaction of the naturalization court that he is opposed to any type of service in the Armed Forces of the United States by reason of religious training and belief shall be required to take an oath containing the substance of said clauses (1)–(4) and clause (5) (C). The term 'religious training and belief' as used in this section shall mean an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code. * * *"

2. One, of course, might argue that Mrs. Weitzman satisfies the *Seeger* test, that is, that the basis for her pacifism occupies for her "a place parallel to that filled by the God of those admittedly qualifying * * *." United States v. Seeger, supra, 380 U.S. at 176, 85 S.Ct. at 859. This is because one might stress her dislike of being regarded as an atheist and those aspects of her views which are emotional and not rational and thus arguably based on faith. See the unreported opinion of Judge Warren J. Ferguson filed January 30, 1968, in In re Naturalization of Nomland (C.D.Cal.).

arms on behalf of the United States, to perform noncombatant service in the Armed Forces of the United States, and to perform work of national importance under civilian direction (unless exempted therefrom)." She signed the oath of allegiance on the petition. This recited that she would bear arms on behalf of the United States or perform noncombatant service in the armed forces or perform work of national importance under civilian direction, all "when required by the law".

Mrs. Weitzman's earlier "Application to File Petition for Naturalization" recited that since her entry she had resided in California and Minnesota and that she had two children born in Los Angeles on December 29, 1962, and August 16, 1964, respectively. She answered affirmatively questions whether she believed in the Constitution and form of government of the United States and whether she was willing to take the full oath of allegiance to the United States. She also answered affirmatively questions whether she was willing to perform noncombatant services in the armed forces and to perform work of national importance under civilian direction. She answered negatively, however, the question whether she was willing to bear arms; to this was added, "My objection to the bearing of arms is based on a belief in a Supreme Being."

*Agreed facts.* The parties submitted an agreed statement of the case as permitted by Rule 10(d), Federal Rules of Appellate Procedure. This recited that the following facts, among others, were developed during the preliminary examination before the designated naturalization examiner and during the de novo hearing before the district judge:

"The petitioner is of Jewish parentage and in her early years went to State schools which had religious instruction in the Protestant faith such as daily prayers and Bible lessons [sic]. She was usually excused from this instruction, because she was not at that time a Christian. At

approximately 15 or 16 years of age, she converted to the Baptist faith in her search for a more meaningful life and in order to discover man's relationship to the universe. However, soon after this conversion, she found that conventional, traditional religious answers did not satisfy her. Although she has not been a formal member of any religious body since that time, she maintains a relatively knowledgeable understanding of traditionally religious principles and beliefs.

"Petitioner graduated from high school in South Africa. * * * At the time of her hearing in the District Court, she was enrolled at the University of Minnesota and was completing her freshman year.

"The petitioner described her pacifism at the District Court hearing as follows:

" 'My pacifism is not based on any religious or cosmological beliefs. I am a pacifist because of a biological push not a theological pull. As a human being, I have an instinctive aversion to killing other human beings. I believe that this instinct is natural and present in all human beings and is necessary for the preservation of our species.

\* \* \* \* \* \*

" 'Organized aggression can lead to the destruction of the species, especially as technology gives man the means to put a great distance between pressing a button or pulling a trigger and viewing the actual destruction of another human being; such cold-blooded murder is unnatural.

" 'The instinct to kill for self-preservation is biologically natural. My pacifism is basically biological and instinctive. It is not cognitive.

\* \* \* \* \* \*

" 'Why am I a pacifist? Perhaps it is because I am a mother. I like to think, however, that it is simply because I am a human being.

" 'Man perceives an order in the Universe, but this does not mean that nature is ordered. In his mind, man orders the Universe to make predictions which enable him to survive. The very fact that man survives is evidence that order exists—but this order is a result of accumulation of chance events. In some instances, the chance that something will happen is so great that we perceive it as a certainty, although the chance exists, however, [sic] remote, that this event will not occur. * * *

" 'To say that order is rational, is to assume a thinking mind controlling the Universe. This is what men believed in the Eighteenth Century. I find it impossible to believe.'

At several points during her testimony, the petitioner referred to her pacifism as something 'instinctual' or 'emotional', and not particularly rational. She states that her pacifism was 'biological' and that she had an 'instinctive revulsion against killing a member of my species.'

"Petitioner described herself as 'a pacifist in all respects' and not just in selected circumstances or wars. She also testified that a basis for her belief was that she was a mother who, in having children, had created life:

" 'I have passed on genetic material to two children who are going to pass it on, I hope, to other children and other people, and this is creating our species, and by going to bear arms, I am going out to negate what I have done.'

"In defining the basis for her pacifist beliefs, she testified that she did not believe in any supernatural power, Supreme Being, or superior relationship. She stated that she does not know who or what is responsible for human life or human existance [sic]. When asked if she was an atheist, petitioner responded as follows:

" 'Well, that word has negative connotations that I think none of us like. It is a word I do not particularly care to use. It puts me in a box, perhaps, more than I would rather like to be there. I would say I do not believe in supernatural power.'

In response to a question asking if she was 'religious', she replied:

" 'Well, if you mean religious as someone who belongs to an organized group and goes to a particular place at a set time to meet with others of this group to perform certain rituals, no, I am not religious. * * I have a certain manner of acting, presuppositions which I use when I make decisions. I don't know that I would call this a religion.'

"The District Court found that the petitioner was completely sincere in her beliefs and that her credibility was beyond doubt."

In factual summary, therefore, we have an applicant who is willing to take the citizenship oath prescribed by § 337(a) to the extent of clauses (1), (2), (3), (4), and (5) (C), the latter being the alternative directed to willingness "to perform work of national importance under civilian direction when required by the law." She is not willing, however, to subscribe to clause (5) (A) or to clause (5) (B). The statute permits the avoidance of clauses (5) (A) and (5) (B) and the use of the alternative (5) (C) if the applicant is otherwise qualified and "shows by clear and convincing evidence to the satisfaction of the naturalization court that he is opposed to any type of service in the Armed Forces of the United States by reason of religious training and belief * * *." And "religious training and belief" is defined to mean "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code."

*The trial court's primary finding.* Chief Judge Devitt found, 284 F.Supp. at 517, as had the examiner, that Mrs. Weitzman's "objection to rendering mili-

tary service is based on a personal moral code and not on religious training and belief."

*Preliminary comment.* I would not wish to prejudice Mrs. Weitzman for any deficiency in her choice of words in self-description. As noted above, however, with able counsel's acquiescence she has deliberately abandoned her former alternative argument that her belief satisfies the parallelism test developed and expounded in the different context of United States v. Seeger, supra. The district court's finding, as a consequence, stands purportedly unchallenged on appeal. Compare Welsh v. United States, 404 F. 2d 1078, 1086 Note (9 Cir. 1968), cert. granted, 396 U.S. 816, 90 S.Ct. 53, 24 L. Ed.2d 67.

I yield to no one in entertaining profound respect for sincere personal conscience. Conscience, perhaps, is one of the hopes of the world. I was, after all, a member of this court's panel which recently decided United States v. Levy, 419 F.2d 360 (8 Cir. 1969). At the same time I see no reason to pamper Mrs. Weitzman and to say to her that she must not choose to abandon the parallelism test on this appeal because, if she does, she may not achieve citizenship. Mrs. Weitzman obviously is a mature, intelligent, articulate woman who desires naturalization but who desires it on her own precisely proposed terms, who wants the constitutional issue forced upon us and decided, and who is capable of making an intelligent tactical choice. She has made that choice here. I feel that she deserves to have us accept it. I therefore conclude that the parallelism test is now out of her case.

This being so, it follows that, as an appellate court, we start with the established and unchallenged fact and conclusion that the applicant's willingness to subscribe to clause (5) (C) of the naturalization oath, and her unwillingness to subscribe to either clause (5) (A) or clause (5) (B) of that oath, are due to "a merely personal moral code", within the language and meaning of § 337(a).

The constitutional issue Mrs. Weitzman raises is accordingly presented unfettered by any collateral fact controversy. I wistfully might hope it were otherwise, for the constitutional issue may be far more troublesome than *Seeger's* parallelism test. In *Levy*, supra, 419 F.2d at 367, we viewed the latter as perhaps necessary "to avoid constitutional objections" even though it "may significantly reduce the vitality of the personal moral code test * * *." See Mr. Justice Douglas' comment in United States v. Seeger, supra, 380 U.S. at 188, 85 S.Ct. 850 (concurring opinion).

In any event, for me, the constitutional issue, by Mrs. Weitzman's design, perhaps mischievous, perhaps not, and in her apparent desire to gain or lose all upon its resolution, stands bare and quivering before us and demands decision.

*The naturalization power.* This is expressly bestowed by the Constitution. Article I, Section 8, states: "The Congress shall have Power * * * To establish an uniform Rule of Naturalization * * *."

Long ago Mr. Chief Justice Marshall observed,

"That the power of naturalization is exclusively in congress does not seem to be, and certainly ought not to be, controverted * * *." Chirac v. Chirac, 15 U.S. (2 Wheat.) 259, 269, 4 L.Ed. 234 (1817).

And again,

"The simple power of the national legislature is, to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual." Osborn v. The President, etc., of the Bank of the United States, 22 U.S. (9 Wheat.) 738, 827, 6 L.Ed. 204 (1824).

Later, in United States v. Wong Kim Ark, 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898), Mr. Justice Gray said,

"Nor can it be doubted that it is the inherent right of every independent nation to determine for itself, and ac-

cording to its own constitution and laws, what classes of persons shall be entitled to its citizenship."

The Justice went on to observe, 169 U.S. at 701–703, 18 S.Ct. at 464, that the power granted to Congress by the Constitution to establish a uniform rule of naturalization was vested exclusively in Congress; that citizenship by naturalization "can only be acquired by naturalization under the authority and in the forms of law"; and that the power of naturalization "is a power to confer citizenship, not a power to take it away."

Still later, the Court stated,

"Naturalization is a privilege, to be given, qualified or withheld as Congress may determine, and which the alien may claim as of right only upon compliance with the terms which Congress imposes. That Congress regarded the admission to citizenship as a serious matter is apparent from the conditions and precautions with which it carefully surrounded the subject." United States v. Macintosh, 283 U.S. 605, 615, 51 S.Ct. 570, 572, 75 L.Ed. 1302 (1931).

Similar expressions appeared in United States v. Schwimmer, 279 U.S. 644, 649–650, 49 S.Ct. 448, 73 L.Ed. 889 (1929), and United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 72 L.Ed. 654 (1928). This court, too, has stated,

"An alien has no inherent right to naturalization as citizenship is a gift or a privilege which a foreign government may refuse or may grant on such conditions as it may prescribe." Ralich v. United States, 185 F.2d 784, 786 (8 Cir. 1950).

Further, in contrast with a denaturalization proceeding or one for deportation, the naturalization applicant

" * * * is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship. Because that status, once granted, cannot lightly be taken away, the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship. For these reasons, it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect. This Court has often stated that doubts 'should be resolved in favor of the United States and against the claimant.' E. g., United States v. Macintosh, 283 U.S. 605, 626, 51 S.Ct. 570, 75 L.Ed. 1302." Berenyi v. District Director, 385 U.S. 630, 637, 87 S.Ct. 666, 671, 17 L.Ed.2d 656 (1967).

Thus, in summary, from these expressions, we have, as applicable guiding principles: (1) that the naturalization power rests with the Congress; (2) that that power rests exclusively there; (3) that the only limitation upon the power is that it be exercised uniformly; (4) that naturalization is a privilege; (5) that it may be claimed by the alien only on the terms Congress has imposed; and (6) that the applicant, and not the government, has the burden of demonstrating his qualifications. In connection with the last, we note that § 337(a) imposes, with respect to the oaths alternative to that for the bearing of arms, a standard of "clear and convincing evidence to the satisfaction of the naturalization court * * *."

*The exercise of the naturalization power.* From the beginning the Congress required that the naturalization process include an oath that the candidate support the Constitution. Act of March 26, 1790, 1 Stat. 103. In 1795 Congress added a provision that the naturalization court find that the alien is "attached to the principles of the Constitution." Act of Jan. 29, 1795, 1 Stat. 414. Like provisions appeared in every subsequent naturalization statute. See, for example, Act of April 14, 1802, 2 Stat. 153; Act of May 26, 1824, 4 Stat. 69; Act of Feb. 10, 1855, 10 Stat. 604. The Naturalization Act of June 29, 1906, 34 Stat. 596, expanded the oath to include the words, "support and defend the Constitution and laws of the United States against all enemies, foreign and domestic * * *."

By 1923 the application form contained the question, "If necessary, are you willing to take up arms in defense of this country?" The requirement to bear arms was not yet a part of the statutory oath, but we are advised by the government here that the Immigration and Naturalization Service took the position that this was inherent in the requirement of attachment to the Constitution and in that part of the then statutory oath by which the alien swears to support and defend the Constitution against all enemies.

The Supreme Court by close votes at first upheld this interpretation on the part of the Service against challenge by a variety of citizenship applicants. United States v. Schwimmer, supra, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889 (1929), with three dissents; United States v. Macintosh, supra, 283 U.S. 605, 51 S.Ct. 570 (1931), with four dissents; United States v. Bland, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319 (1931), with four dissents. The *Macintosh* dissenters departed from the majority on the question whether Congress had exacted a promise to bear arms as a condition of the grant of citizenship. The dissenters felt that this requirement was not to be implied from the statute's general words. 283 U.S. at 627, 51 S.Ct. at 570.

Fifteen years later the Court, by a 5–3 vote, overruled *Schwimmer, Macintosh,* and *Bland.* Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). The Court then concluded that the promise to bear arms would have to be implied and "we could not assume that Congress intended to make such an abrupt and radical departure from our traditions unless it spoke in unequivocal terms." 328 U.S. at 64, 66 S.Ct. at 827.

Congress, by the Act of September 23, 1950, 64 Stat. 987, possibly in reaction to *Girouard,* amended the oath to require the applicant to promise to "bear arms on behalf of the United States or perform noncombatant service in the Armed Forces of the United States when required by law." An alternative oath was also made available for the applicant who could show by clear and convincing evidence that he was opposed to bearing arms or to performing noncombatant service "by reason of religious training and belief". See S.Rep. No. 1515, 81st Cong., 2d Sess. 741 at 745–46 (1950).

The present definition of the term "religious training and belief" came with the 1952 Act. Concededly, the incorporation of this definition into the naturalization statute was related to the standards theretofore established in selective service legislation. Initially, the Service interpreted the requirement as to religious training and belief to include only members of groups opposed to war as a matter of doctrine. This restrictive administrative interpretation, however, proved not to be judicially acceptable. In re Nissen, 146 F.Supp. 361 (D.Mass. 1956); In re Hansen, 148 F.Supp. 187 (D.Minn.1957).

Then came, collaterally for us here, the significant decision in United States v. Seeger, supra, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), concerning appeals from convictions for refusals to submit to induction in the armed forces. The controlling statutory language there [§ 6(j) of the Universal Military Training and Service Act] was then identical to that in § 337(a). The Court struggled with the meaning of "religious training and belief" and concluded,

"Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition. This construction avoids imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others, and *is in accord with the well-established congressional policy of equal treatment for those whose*

*opposition to service is grounded in their religious tenets."* 380 U.S. at 176, 85 S.Ct. at 859 (emphasis supplied).

In arriving at this conclusion the Court observed,

"The section excludes those persons who, disavowing religious belief, decide on the basis of essentially political, sociological or economic considerations that war is wrong and that they will have no part of it. *These judgments have historically been reserved for the Government, and in matters which can be said to fall within these areas the conviction of the individual has never been permitted to override that of the state.* United States v. Macintosh, *supra* (dissenting opinion)." 380 U.S. at 173, 85 S.Ct at 858 (emphasis supplied).

It went on to say,

"Section 6(j), then, is no more than a clarification of the 1940 provision involving only certain 'technical amendments,' to use the words of Senator Gurney. As such it continues the congressional policy of providing exemption from military service for those whose opposition is based on grounds that can fairly be said to be 'religious.' [3] To hold otherwise would not only fly in the face of Congress' entire action in the past; it would ignore the historic position of our country on this issue since its founding." 380 U.S. at 179–180, 85 S.Ct. at 861.

The footnote reference in the preceding quotation reads:

"A definition of 'religious training and belief' identical to that in § 6(j) is found in § 337 of the Immigration and Nationality Act, 66 Stat. 258, 8 U. S.C. § 1448(a) (1958 ed.). It is noteworthy that in connection with this Act, the Senate Special Subcommittee to Investigate Immigration and Naturalization stated: 'The subcommittee realizes and respects the fact that the question of whether or not a person must bear arms in defense of his country may be one which invades the

province of religion and personal conscience.' Thus, it recommended that an alien not be required to vow to bear arms when he asserted 'his opposition to participation in war in any form because of his personal religious training and belief.' S.Rep. No. 1515, 81st Cong., 2d Sess., 742, 746." 380 U.S. at 180, 85 S.Ct. at 861.

One additional legislative change is of interest. Section 1(7) of the Military Selective Service Act of 1967, Pub.L. 90–40, 81 Stat. 104, struck from the language of the theretofore existing Universal Military Training and Service Act, and its definition of "religious training and belief", the reference to "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation." Thus that statute presently states merely that "the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code." 50 U.S.C. App. § 456(j). The reference to a Supreme Being is gone. It remains, however, in the naturalization statute. Despite this change, this court, in the selective service area, has continued to apply the standard promulgated in United States v. Seeger. United States v. Levy, *supra*, 419 F.2d at 366. We there said,

"We believe that the 1967 Act in eliminating reference to a 'Supreme Being' and retaining the 'religious training and belief' clause has worked no change in the requirements for a conscientious objector classification, and the construction placed upon the 1948 Act in the *Seeger* case is the applicable standard."

Thus, in summary, for what it may be worth, one may say that essentially from the beginning naturalization procedures, both statutory and administrative, have required that the applicant support and be attached to the principles of the Constitution. The requirement that he promise to bear arms unless he was a pacifist "by religious training and belief" received formal statutory recognition only in 1950. And with the *Seeger*

case in 1965 we have the enunciation, in the selective service context, of the parallelism test focusing on some external force greater than human relationships. Again, for what it is worth, the naturalization statute and the present selective service statute now differ in their definitions of "religious training and belief" in that the former still retains, while the latter does not, the reference to a relation to a Supreme Being.

It is obvious, however, that with Mrs. Weitzman's renunciation of all reliance upon a religious test and with the confinement of her appeal solely to the constitutional issue as it concerns her identity with a nonreligious status, many of the problems which may arise, and of which *Seeger* is illustrative, in connection with the concept of religion are not present here. Our constitutional issue becomes one essentially of classification as between the religious person, however that be defined, and the expressly nonreligious.

Mrs. Weitzman asserts that § 337(a), in its requirement that an applicant for citizenship who is a conscientious objector demonstrate that his pacifism is by reason of religious training and belief, despite the broad interpretation of that phrase, (1) violates the establishment clause of the first amendment, (2)

violates the free exercise clause of the first amendment, and (3) denies to her the due process and equal protection guarantees of the fifth amendment. She also asserts that Congress' authority to withhold citizenship is not unlimited.

The applicant argues that § 337(a) "sanctions a religion based upon a belief in a Supreme Being." She cites Mr. Justice Black's ringing phrases in Everson v. Board of Educ., 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947),[3] a 5–4 decision in a school case; Illinois ex rel. McCollum v. Board of Educ., 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 648 (1948), another school case; Mr. Justice Black's language in Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961),[4] the Maryland notary case; and the test involved in the prayer decision, School District of Abington Township v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571 (1963).[5] (To this list I might add Mr. Justice Fortas' comments in Epperson v. Arkansas, 393 U.S. 97, 103–104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)). She asserts that, in order to become a citizen and still maintain her status as a conscientious objector, the statute forces her to profess some religion that has as its basis a belief in a Supreme Being; that this imposes a requirement which aids religion against nonbelievers; that the authority of the government is thus put

3. "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or nonattendance. * * * In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'"

4. "We repeat and again reaffirm that neither a State nor the Federal Government

can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs" (footnotes omitted).

5. "The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

on the side of a particular group; and that the statute contributes to the advance of religion because it puts a congressional stamp of approval on religious conscientious objectors by denying citizenship to nonreligious ones.

One might, of course, initially ask whether Mrs. Weitzman, as an alien, is entitled to first amendment protections at all. The Supreme Court has stated clearly that resident aliens are to be accorded the first amendment guarantees of free speech and free press. Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945). Mr. Justice Murphy, separately concurring in that case, went so far as to say that an alien who has lawfully entered the country and resides here

"becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process· clause of the Fourteenth Amendment."

This language of concurrence was footnote quoted with apparent approval by the Court's majority in Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953), where the protection of the fifth amendment was held available for a resident alien. I would not presume to hold otherwise with respect to the establishment or free exercise clauses and I therefore would grant that Mrs. Weitzman is entitled to the first amendment protections to which she here lays claim.

With this preliminary inquiry ·behind me, Mrs. Weitzman's constitutional arguments admittedly possess some appeal. On analysis, however, I must reject them for the following reasons:

1. The above historical summary conclusively demonstrates, I feel, that the "religious training and belief" connection with conscientious objection came into the statute not at all as "an establishment of religion" or as a prohibition of the free exercise of religion but, on the contrary, as a legislative accommodation of

religious freedom. Mr. Justice Clark, in the primary *Seeger* opinion, outlined the efforts of colonial, state, and federal governments to ameliorate the plight of persons of various faiths when called to bear arms. 380 U.S. at 169–173, 85 S.Ct. 850. The statutory requirements were forged in the 4-vote dissent written by Mr. Chief Justice Hughes in United States v. Macintosh, supra:

"Much has been said of the paramount duty to the State, a duty to be recognized, it is urged, even though it conflicts with convictions of duty to God. Undoubtedly that duty to the State exists within the domain of power, for government may enforce obedience to laws regardless of scruples. When one's belief collides with the power of the state, the latter is supreme within its sphere and submission or punishment follows. But, in the forum of conscience, duty to a moral power higher than the state has always been maintained. * * * One cannot speak of religious liberty, with proper appreciation· of its essential and historic significance, without assuming the existence of a belief in supreme allegiance to the will of God. * * * The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field. What that field is, under our system of government, presents in part a question of constitutional law and also, in part, one of legislative policy in avoiding unnecessary clashes with the dictates of conscience. * * * The Congress has sought to avoid such conflicts in this country by respecting our happy tradition. In no sphere of legislation has the intention to prevent such clashes been more conspicuous than in relation to the bearing of arms. It would require strong evidence that the Congress intended a reversal of its policy in prescribing the general terms of the naturalization oath. I find no

such evidence." 283 U.S. at 633–635, 51 S.Ct. at 578.

This source was recognized by Mr. Justice Douglas in Girouard v. United States, supra:

"As Mr. Chief Justice Hughes pointed out (United States v. Macintosh, supra, 283 U.S. page 633, 51 S.Ct. at page 578, 75 L.Ed. 1302), religious scruples against bearing arms have been recognized by Congress in the various draft laws. * * * This respect by Congress over the years for the conscience of those having religious scruples against bearing arms is cogent evidence of the meaning of the oath.

\* \* \* \* \* \*

" * * * The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the ages, men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle." 328 U.S. at 66–68, 66 S.Ct. at 828.

It seems fair to say, then, that in the light of history § 337(a) is another example of what Mr. Chief Justice Hughes referred to as "our happy tradition" of avoiding conflicts between belief and governmental necessity.

2. Along with the concept that citizenship is a privilege, although not to be granted or withheld on unconstitutional conditions, see Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), I note that the naturalized citizen, as does the native born, receives various benefits including protection in other parts of the world. Allegiance is therefore important. Baumgartner v. United States, 322 U.S. 665, 673, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); Sittler v. United States, 316 F.2d 312, 324 (2 Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652. The oath provides an acceptable test of allegiance.

3. By the Constitution Congress is vested with the power "To raise and support armies * * *." Article I, Section 8, clause 12. In fiscal 1967 approximately 105,000 persons were naturalized. Report of the Attorney General, 1967, p. 462. At that rate a million new citizens are added by naturalization in a decade. This is a substantial segment of the nation's human resources. It seems entirely appropriate for Congress to regard the citizenship applicant as a potential defender of his country. While selective service legislation applies to the resident alien, it also provides him with an avenue of relief from service, 50 U.S.C. App. § 454(a); his being subject thereto thus does not detract from the propriety of Congress' relating allegiance to the naturalization process.

4. There are other examples in the naturalization area of congressional concern about aliens who wish to have this country's benefits without the burden of military service. Section 212(a) (22) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a) (22), excludes from admission aliens "who have departed from or who have remained outside the United States to avoid or evade training or service in the armed forces in time of war * * *." See Ramasauskas v. Flagg, 309 F.2d 290 (7 Cir. 1962). Section 314 of the Act, 8 U.S.C. § 1425, makes ineligible for citizenship a person convicted of deserting the armed forces in time of war. Section 315 of the Act, 8 U.S.C. § 1426 (see, also, 50 U.S.C. App. § 454(a)), makes ineligible for citizenship an alien who applies for exemption or discharge from service in the armed forces on the ground that he is an alien. The congressional pattern is apparent and is consistent.

5. "It has long been held that the Congress has plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden."

Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967). The limitation is that there be uniformity.

6. The constitutionality of the accommodation afforded religion by Congress in the military service area has been upheld by the Supreme Court. The 1917 draft laws contained an exemption for persons who were members of religious sects opposed to war in any form and who personally held those convictions. The statute was challenged on several grounds, including the establishment and free exercise clauses. Mr. Chief Justice White, in writing for a unanimous tribunal which included the renowned libertarians, Mr. Justice Holmes and Mr. Justice Brandeis, said,

> "And we pass without anything but statement the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act to which we at the outset referred, because we think its unsoundness is too apparent to require us to do more." Selective Draft Law Cases, 245 U.S. 366, 389–390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918).

This was a peremptory brushing aside, as frivolous, of the very argument which is advanced by Mrs. Weitzman here. Like rulings appear to have been made in Goldman v. United States, 245 U.S. 474, 38 S.Ct. 166, 62 L.Ed. 410 (1918); Kramer v. United States, 245 U.S. 478, 38 S.Ct. 168, 62 L.Ed. 413 (1918); Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); Yanyar v. United States, 246 U.S. 649, 38 S.Ct. 332, 62 L.Ed. 920 (1918); and Stephens v. United States, 247 U.S. 504, 38 S.Ct. 579, 62 L.Ed. 1239 (1918). The issue in these World War I cases seems to me to have arisen in a more difficult context because the statute there under consideration restricted the exemption to members of qualifying religious sects and made no provision for a different kind of believer. I am in no position to rule contrarily to those cases.

7. The required separation of church and state does not compel the Congress to ignore religious beliefs or to be hostile to religion in the framing of legislation which implements a secular purpose. I regard the effort of the government to avoid an intrusion upon freedom of religion in the naturalization statute as one to remain neutral rather than to prefer religion. There are examples of this in the decided Supreme Court cases: In Everson v. Board of Educ., supra, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, the Court upheld the payment of bus fares to children attending parochial as well as public schools. In Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Court upheld a public school program releasing children to attend religious instruction in their places of worship. There Mr. Justice Douglas said,

> "We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. * * * When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. * * * The government must be neutral when it comes to competition between sects. It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction. But it can close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction. No more than that is undertaken here." 343 U.S. at 313–314, 72 S.Ct. at 684.

In *Zorach* the Court did not suggest or insist that nonreligious parents had the right to have their children similarly re-

leased for nonreligious purposes. The program under challenge did not allow for this. The Court upheld the accommodation of religion even though no equivalent exemption from attendance was extended to nonreligious persons. Finally, in Board of Educ. v. Allen, 392 U. S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Court upheld a New York statute requiring school books to be loaned free to all students, both public and parochial. The Court observed, "The law merely makes available to all children the benefits of a general program to lend school books free of charge." 392 U.S. at 243, 88 S.Ct. at 1926. This was held to meet the standard in *Schempp* that "there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." 374 U.S. at 222, 83 S.Ct. at 1571.

8. The Blue Law cases also have some significance. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); Braunfeld v. Brown, 366 U.S. 599, 81 S. Ct. 1144, 6 L.Ed.2d 563 (1961); Gallagher v. Crown Kosher Supermarket, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961). These, it seems to me, are examples of accommodation of the religious and governmental interests involved. It is evident from the several opinions that the prevailing Justices were in agreement that an exemption from the Blue Laws limited to persons required to close on Saturday because of religious beliefs was not a violation of the first amendment.

9. If Mrs. Weitzman's constitutional arguments are to prevail, it may not follow that she is entitled to naturalization. The legal result might be to deny the benefit of conscientious objection to the religious believer, not to extend it to the nonbeliever. See and compare Quong Ham Wah Co. v. Industrial Accident Comm'n, 184 Cal. 26, 192 P. 1021 (1920), error dismissed, 255 U.S. 445, 41 S.Ct. 373, 65 L.Ed. 723 and Dellinger v. Arkansas State Bd. of Optometry, 214 Ark.

562, 217 S.W.2d 338, 340 (1949). But this result would upset all the holdings approving the "religious training and belief" conscientious objection.

10. The decided cases, as has been pointed out, demonstrate an accommodation to religious belief. They do not demonstrate an accommodation to social belief or to philosophical views or to ideas of personal morality. One in his heart may believe, in the Robin Hood tradition, that it is proper to steal from the rich and give to the poor, but we still prosecute the thief for his stealing.

11. I fail to visualize the coercion to which Mrs. Weitzman claims to be subjected. She is not forced to become naturalized. Many aliens resident in this country never do take that step. But they live in peace here and enjoy the benefits of residence within our borders. It is only when one asks for the privileges of citizenship that the condition which Congress has imposed becomes operative.

12. Mrs. Weitzman's fifth amendment arguments, of course, center in due process and the equal protection concept which is inherent in due process. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). This comes down to a question of classification and the reasonableness or arbitrariness of that classification, or, as has been said, "some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966); Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660 (1954). See McDonald v. Board of Election Comm'rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed. 2d 739 (1969). I cannot say that a distinction drawn between conscientious objection based on religious training and belief, on the one hand, and conscientious objection not so based, on the other, is inherently and constitutionally unreasonable. The area of conflict between the demands of government and one's personal convictions is, at best, an area where adjudication is difficult. It seems to me, however, that the dilemma for the secu-

lar individual is of a different and lesser order than that for the religious individual. For the latter only a religious solution is permissible. Congress in its wisdom has chosen to recognize it.

13. Mrs. Weitzman notes that the Supreme Court has observed that its decisions "have consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). It is then said that it should be clearly demonstrated what there is about nonreligious conscientious objectors that makes them unworthy of citizenship. I would not so lightly brush aside the existence of a compelling governmental interest. The Congress obviously concluded that considerations of national survival support the statute.

14. Of course, as the applicant argues, congressional power is subject in its exercise to constitutional limitations including first amendment freedoms. It is often, however, a matter of balancing a legitimate legislative purpose against restrictions imposed on rights otherwise guaranteed by the amendment. See William E. Palmer, 52 T.C. 310, 314–315 (1969). Legislation may cast an indirect burden on the exercise of religion and still not be violative of the first amendment. See the opinion of Mr. Chief Justice Warren in Braunfeld v. Brown, supra, 366 U.S. at 606, 81 S.Ct. 1144. Certainly, then, an indirect burden on the irreligious is not necessarily violative of the amendment.

15. I search Mr. Justice Douglas' opinion for the majority in Girouard v. United States, supra, unrewardedly for any intimation that the Court's ruling that that applicant was to be admitted to citizenship was based on something other than expressed religious scruples and convictions. Those are the very terms which the Court employed. The applicant's claim to citizenship rested on principles of his Seventh Day Adventist faith. The Court could have expanded its remarks, had it chosen so to do, to scruples of general conscience. It did not do this.

16. The Supreme Court, although possessing the opportunity on more than one occasion, has declined to hold the religion-based conscientious objection in draft cases unconstitutional on first amendment grounds. The decision in the Selective Draft Law Cases, supra, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 is, of course, the prime example. The establishment and free exercise argument, in the light of the absence of an exemption for nonreligious conscientious objectors, was raised in United States v. Seeger, supra, 380 U.S. at 165, 85 S.Ct. 850, 13 L.Ed.2d 733, but, in view of the parallelism test there developed, was not adjudicated by the Supreme Court. In lower court draft cases where the challenge was made and rejected, the Supreme Court, until the current term, has not seen fit to grant certiorari. Etcheverry v. United States, 320 F.2d 873, 874 (9 Cir. 1963), cert. denied, 375 U.S. 930, 84 S.Ct. 331, 11 L.Ed.2d 263, rehearings denied 375 U.S. 989, 84 S.Ct. 515, 11 L.Ed. 2d 476, 376 U.S. 939, 84 S.Ct. 791, 11 L.Ed.2d 660 and 380 U.S. 926, 85 S.Ct. 878, 13 L.Ed.2d 813; Clark v. United States, 236 F.2d 13, 23–24 (9 Cir. 1956), cert. denied, 352 U.S. 882, 77 S.Ct. 101, 1 L.Ed.2d 80, rehearing denied 352 U.S. 937, 77 S.Ct. 219, 1 L.Ed.2d 169; George v. United States, 196 F.2d 445, 447–450 (9 Cir. 1952), cert. denied, 344 U.S. 843, 73 S.Ct. 58, 97 L.Ed. 656. (In United States v. Bendik, 220 F.2d 249, 252 (2 Cir. 1955), the constitutional challenge was rejected but, apparently, no application for certiorari was made. See footnote 2 of the Second Circuit's opinion in United States v. Seeger, 326 F.2d 846, 851 (1964)). It may be that these actions by the Court have been "in the candid service of avoiding a serious constitutional doubt". United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953); United States v. Seeger, supra, 380 U.S. at 188, 85 S.Ct. 850

(Mr. Justice Douglas concurring). Nevertheless, it was only when a holding of unconstitutionality was forthcoming in United States v. Sisson, 297 F.Supp. 902 (D.Mass.1969), and when a Ninth Circuit panel divided as to the availability of the constitutional ground, Welsh v. United States, supra, 404 F.2d 1078 (9 Cir. 1968), that we have both cases taken by the Supreme Court. 396 U.S. 812 and 816, 90 S.Ct. 92, 24 L.Ed.2d 65.

A word is in order with respect to the *Sisson* case. At issue there was the constitutionality of the application to *Sisson* of § 6(j) of the Military Selective Service Act of 1967, 50 U.S.C. App. § 456(j). Chief Judge Wyzanski held that the free exercise and establishment clauses of the first amendment and the due process clause of the fifth amendment prohibit the application of the Act to one who is not a religious conscientious objector in a formal sense but who, nevertheless, is conscientiously opposed to American military activities only in Vietnam.

Perhaps *Sisson* may be distinguished from Mrs. Weitzman's case. *Sisson* is a criminal proceeding and it concerns a statute other than the one our applicant challenges. Sisson had been drafted and felt that service for him in Vietnam was imminent. His pacifism was selective; it was Vietnam service to which he was opposed. Mrs. Weitzman's opposition is more broadly asserted. "The rationale by which Seeger and his companions on appeal were exempted from combat service under the statute is quite sufficient for Sisson to lay valid claim to be constitutionally exempted from combat service in the Vietnam type of situation." 297 F.Supp. at 909. Mrs. Weitzman expressly disavows this. "Most important, it does not follow from a judicial decision that Sisson cannot be conscripted to kill in Vietnam that he cannot be conscripted for non-combat service there or elsewhere." 297 F.Supp. at 910. Mrs. Weitzman claims the lesser duty under clause (5) (C) of § 337(a), and would avoid obligation for noncombatant service in the armed forces.

Yet Judge Wyzanski flatly held:

"Moreover, it is difficult to imagine any ground for a statutory distinction except religious prejudice. In short, in the draft act Congress unconstitutionally discriminated against atheists, agnostics, and men, like Sisson, who, whether they be religious or not, are motivated in their objection to the draft by profound moral beliefs which constitute the central convictions of their beings." 297 F.Supp. at 911.

I wonder. Perhaps in the draft-criminal law context this is so. The Supreme Court may soon tell us. However, in the naturalization context where the government is bestowing and not demanding, and where Mrs. Weitzman is requesting citizenship on her own terms, I would hold otherwise.

If Mrs. Weitzman's constitutional arguments are to prevail, our concepts of constitutionality have progressed far beyond the Hughes-Holmes-Brandeis days when enunciated allegiance and devotion to the country had primary and significant meaning. As a member of an inferior federal court, I feel that we cannot go that far even in this permissive day.

I would affirm.

LAY, Circuit Judge.

I think it is incumbent upon this court to pass upon the merits of Mrs. Weitzman's claimed conscientious objector status under the Immigration and Nationality Act, 8 U.S.C. § 1448. Appellant claimed during her trial that her beliefs were religious within the scope of the statute. The trial court held the beliefs were non-religious. On appeal, she does not allege error in this decision but rather challenges the constitutionality of the statute. This court should not reach a constitutional issue prematurely but pass upon the constitutionality of a statute only when the conflict is unavoidable. Thorpe v. Housing Authority, 393 U.S. 268, 283–284, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Rosenberg v. Fleuti, 374 U.S. 449, 451, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). Thus, the abandoning of a

valid claim on appeal cannot dictate to the court when it must reach a constitutional issue. In United States v. International Union United Auto Workers, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), the Supreme Court stated:

"Counsel are prone to shape litigation, so far as it is within their control, in order to secure comprehensive rulings. * * * Such desire on their part is not difficult to appreciate. But the court has its responsibility." *Id.* at 592, 77 S.Ct. at 541.

Implicit within our reaching the constitutional issue is a determination of the factual posture of the petitioner. Without this consideration, a justiciable issue cannot be presented. To hold otherwise would allow a party, without proper standing and by indirection, to effect an advisory opinion by a court on serious constitutional issues.

█ Under these circumstances, the merits of whether in fact the petitioner qualifies for the exemption should not and cannot be so easily eluded. See Henry v. Mississippi, 379 U.S. 443, 449, 85 S. Ct. 564, 13 L.Ed.2d 408 (1965); Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion).

I come then to a consideration of whether Mrs. Weitzman qualifies for exemption under § 1448 as a conscientious objector based upon "religious" grounds. Mrs. Weitzman refused to categorize her beliefs as "religious." However, in both the naturalization hearings of March 3, 1967, and May 11, 1967, as well as in her testimony before Judge Devitt on March 4, 1968, she refused to do so for two basic reasons, (1) for want of definition of the term "religious" and (2) because she did not belong to any organized religious sect. No one should disagree that earnest sincerity is better than glibness of tongue. Her refusal to rest her claimed exemption upon words of diffuse meaning ("religion," "Supreme Being")

should be weighed in her favor, and points up the shallowness of legal decisions which rest upon formal nomenclature. A person who holds a sincere religious belief should be judged under the law by the substance of that belief and not as to what she or he may call it.

This court has recently passed upon the meaning of the term "religious" under the conscientious objector exemption of the Selective Service Act. United States v. Levy, 419 F.2d 360 (8 Cir. Dec. 8, 1969). We there equated the belief of the registrant with "some force or Supreme Being" in that the registrant said simply "that he must act according to what he believes is right, and this obligation is greater than his obligation to secular authorities." *Id.* at 367. And we concluded that "any type of sincerely held belief opposing war generally would be difficult to rule out under *Seeger.*" Id. at 368.

The following language of United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), is controlling here:

"The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. *But these are inquiries foreclosed to Government.* As Mr. Justice Douglas stated in United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944): 'Men may believe what they cannot prove. *They may not be put to the proof of their religious doctrines or beliefs.* Religious experiences which are as real as life to some may be incomprehensible to others.' Local boards and courts in this sense are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, *in his own scheme of things,* religious." *Id.* at 184–185, 85 S.Ct. at 863 (1965). (My emphasis.)

In the March 3, 1967, hearing before the Immigration and Naturalization Service, Mrs. Weitzman significantly said: "I do not believe there is * * * anything that I am unaccountable for. I do [sic] believe I have to account to anything but my *conscience*." She continued: "I believe in an order of being. * * * [I] didn't create orderly existence * * *."

At the same hearing in which Mrs. Weitzman was read the definition of "Supreme Being" from *Seeger* as then applied under § 6(j) of the Universal Military Training & Service Act, 50 U.S.C. App. 456(j), she was asked: "Mrs. Weitzman, do you believe in that type of Supreme Being?" Her answer: "Well, not a section of the definition. I do believe there is—over existence." And the following question was asked: "And is it because of your belief in that order of existence the reason why you will not bear arms?" She answered: "Yes."

At the May hearing she stated: "I believe in the dignity of man and in the inviolability of the human body and that each man should respect the dignity of every man and inviolability of every man's person."

The following testimony was given before Judge Devitt on March 4, 1968:

"THE COURT: Would you say you are religious or would you say that you are irreligious or can you fit into either of those categories?

"THE WITNESS: Well, how do you define religious, Your Honor?

"THE COURT: How does it strike you?

"THE WITNESS: Well, if you mean religious as someone who belongs to an organized group and goes to a particular place at a set time to meet with others of this group to perform certain rituals, no, I am not religious.

"THE COURT: Then do you feel you have some kind of a personal religion?

"THE WITNESS: Well, I have a certain manner of acting, pre-suppositions which I use when I make decisions. I don't know that I would call this a religion." [1]

She had earlier made another significant statement:

"A. I am saying that this isn't my personal moral principles. This is something instinctual. It isn't rational. I haven't—it didn't come originally from my mind, although I tried to reason it out. I believe it is biological. It is instinctual. It is emotional, and I think that answers your question." [2]

And then she was asked:

"Q. Is your objection to the bearing of arms because to do so would be contrary to your personal moral beliefs?"

And her answer was:

"A. My personal and moral beliefs are what I consider rationalizations of this biological and instinctive drive." [3]

Summarizing she said:

"A. Well, inasmuch as order, the accumulation of chance events controls the genetic material inherited by man, this controls my instincts and my biological drive, and that is what—that is the reason on which my pacifism is based." [4]

Mrs. Weitzman is not original in what I think the law should call her "religious belief." The early Greek and Roman Stoics felt that "good" was of inner necessity. They felt that it was man's duty to obey the natural law. The Stoics related their ethics to a *pantheistic* cosmology. Stoicism accepted knowledge of law as "instinctive and *a priori*, it being perceived by means of intuitively evident 'common notions.'" 8 The New Schaff-Herzog Encyclopedia of Religious Knowledge 84 (1910).

The authors of the above work also say:

"Although these ideas were designated as 'innate' (*emphytoi*) before Cicero's

---

1. Record at 45–46.

2. Record at 32–33.

3. Record at 38.

4. Record at 41.

time, he was really the first so to regard this original outfit of the practical reason, and, too, not only in embryo but also in general outline, *inasmuch as the germs of moral laws are found in the animal impulses to procreation and care for the young,* and since the four cardinal virtues are already pre-formed in the sense of perception for truth, social order, size and independence, and fitness and harmony." *Id.* (My emphasis.)

The deists of the Seventeenth and Eighteenth Centuries, who relied on natural theology, borrowed from these early philosophical concepts. And the ancient oriental teachings of Confucius and Tao both taught enlightenment based upon "instinctive" natural law. J. Noss, Man's Religions (3rd ed. 1963).

Within modern Christianity, various beliefs dealing with "Humanism" [5] have grown to be recognized as "full-blown religions." In C. Braden, The World's Religions (rev. ed. 1954), the author relates:

"More important that the cult, more important than traditional belief, more important than any interest in institutional religion, is the interest in humanity and its well-being. The apparent failure of organized religion to heed these values, coupled with the philosophical difficulties involved in maintaining traditional beliefs in face of the advances of modern science, has led many to desert institutional Christianity and become what may be termed humanists, men whose only religion is the religion of humanity. All shades of philosophical and theological belief accompany this fundamental interest. At one extreme stand the materialistic humanists, who think of the universe in terms of mechanism to which no personal appeal can be made for help. Man's use of the forces of nature and of society in the interest of human well-being in the present life offers them the only salvation they are willing to talk about. At the other extreme stand a group who are called Christian humanists, more properly Christian humanitarians, who believe that those same values are most fully guaranteed by belief in a God conceived as personal and known in Jesus Christ, that is, in a Christlike God." *Id.* at 209.

There should be little question that Mrs. Weitzman is a sincere pacifist, and in my judgment, qualifies as being one who reaches this belief on "religious" grounds.

I cannot help but mention Mrs. Weitzman's reasons as to why she desires to become a citizen of the United States. She stated before Judge Devitt:

"I should like to become a citizen of the country which for many years the world has thought the United States to be. This country was established on the principles of equality, justice and freedom. *Included in freedom—and of importance to me—is freedom of religion.* In fact, the search for freedom of religion is what led many of the original colonists to this country. This freedom is expressed in the Constitution as separation of church and state. I wish to become a citizen of the country where separation of church and state is a fact, not merely a professed ideal. If separation of church and state is not a fact in the United States then I would no longer be interested in becoming a citizen. I wish to become a citizen of the United States regardless of my beliefs—not because of them." (My emphasis.) [6]

It is true that Mrs. Weitzman seeks the privilege of citizenship and must meet certain statutory standards. Yet it appears paradoxical to me that in a country which was founded *as a result of* religious inquisitions, and which has so

5. Secular Humanism is acknowledged as a "religion" in Torcaso v. Watkins, 367 U.S. 488, 495 n. 11, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). See also *Defin-*

*ing Religion: Of God, The Constitution and the D.A.R.,* 32 U.Chi.L.Rev. 533, 546 (1964-65).

6. Record at 23-24.

firmly alleged the freedom to believe or not to believe [7] to be among the first of the people's rights, that we now say that citizenship may be denied because the belief of the petitioner is not in conformity with an acceptable definition of religion.

█ I do not endorse the right of government to make inquiry into the religious faith of any of its citizens or potential citizens to see whether or not it is sufficiently "religious." I think this much is enshrined within the First Amendment. The dark history of religious torment over enforced dogma is too recent for us to allow a religious inquisition for the price of citizenship. I do not reach the constitutional issue. Mrs. Weitzman has established her sincere belief as a conscientious objector on the basis of conscience and sincere conviction. This should be enough. To require her to further justify this faith in scientific terms or as one of religious orthodoxy is patently wrong. Under our Constitu-

---

7. Although Mrs. Weitzman has demonstrated she is not a non-believer, we should be ever mindful of the statement in Torcaso v. Watkins, supra, where the Court said:

"We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." 367 U.S. at 495, 81 S.Ct. at 1683.

In Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), Mr. Justice Black said that the "establishment clause" of the First Amendment means at least that a state or federal government can neither "pass laws which aid one religion, aid all religions, or prefer one religion over another." He continued:

"Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." Id. at 15–16, 67 S.Ct. at 511.

In the first "flag salute" case, Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), Mr. Justice Stone, in dissent, expressed sentiments soon thereafter to be accepted:

"For by this law the state seeks to coerce these children to express a sentiment which, as they interpret it, they do not entertain, and which violates their deepest religious convictions." Id. at 601, 60 S.Ct. at 1016.

\*　　\*　　\*　　\*　　\*

"I cannot conceive that in prescribing, as limitations upon the powers of government, the freedom of the mind and spirit secured by the explicit guaranties of freedom of speech and religion, they intended or rightly could have left any latitude for a legislative judgment that the compulsory expression of belief which violates religious convictions would better serve the public interest than their protection." Id. at 605, 60 S.Ct. at 1018.

\*　　\*　　\*　　\*　　\*

"The Constitution expresses more than the conviction of the people that democratic processes must be preserved at all costs. It is also an expression of faith and a command that freedom of mind and spirit must be preserved, which government must obey, if it is to adhere to that justice and moderation without which no free government can exist." Id. at 606–607, 60 S.Ct. at 1018.

And of course, in the same context, we should not overlook Justice Jackson's famous rhetoric in West Virginia State Board of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943):

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642, 63 S.Ct. at 1187.

Also of significance here is Mr. Justice Jackson's statement (in dissent) in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), which observes:

"The day that this country ceases to be free for irreligion it will cease to be free for religion—except for the sect that can win political power." Id. at 325, 72 S.Ct. at 689.

tion "religious" belief can mean nothing more.[8]

In Girouard v. United States, 328 U.S. 61, 68, 66 S.Ct. 826, 829, 90 L.Ed. 1084 (1946), the Supreme Court said:

> "The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State."

The judgment should be reversed and Mrs. Weitzman be allowed to take the naturalization oath as a conscientious objector.

**HEANEY, Circuit Judge.**

 I would reverse. I agree that all seeking citizenship can be required to swear a willingness to bear arms in defense of this nation, but I find it difficult to accept the view that Congress can, consistent with the First Amendment, excuse some who sincerely object in conscience to taking an oath to bear arms and refuse to excuse others whose objections are just as deeply rooted.[1] Nor can I accept the view that the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct.

---

8. Arnold Toynbee in his book, Change and Habit (Oxford University Press 1966), has succinctly summarized the philosophy against conformity of religious ideologies. Although his authorship is not documented as constitutional history (cf. J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted as an appendix to the dissenting opinion of Justice Rutledge in Everson v. Board of Educ., 330 U.S. 1, 63, 67 S.Ct. 504, 91 L. Ed. 711 (1947)), it does cause me, at least, certain discomfort when considering an attempt to offer American citizenship on a plate of religious conformity. Toynbee says: (1) "The first and most obvious reason for allowing religious liberty is that it is morally wrong to try to bring about by force a conversion which can be genuine only if it springs from a spontaneous conviction." Id. at 188. (2) "Another reason for allowing religious liberty is that one of our human rights is the right to learn, without restriction, about all the diverse concepts of truth and prescriptions for salvation." Id. at 189. (3) "The true measure of a religion's success is not the number of its adherents; it is the amount of spiritual help that it has succeeded in giving to human beings without regard to their ecclesiastical allegiance." Id. at 194. (4) "Another reason why a plurality and variety of religions is desirable is that this will make for open-mindedness and will be some safeguard against the human mind's constant proneness to lapse into dogma." Id. (5) "Dogma is an ill-conceived attempt to express religious truth in scientific terms. The diversity of the voices with which the different religions speak is a warning that none of them ought to be taken dogmatically. The danger that mankind might fall into a dogmatic spiritual paralysis would be still greater than it is if all the current religions, philosophies, and ideologies were to be fused into one; for this amalgam would almost inevitably come to be consecrated as an exclusive orthodoxy." Id. (6) "Another reason why a plurality and variety of religions will be desirable in a politically unified world is that a world-state will be afflicted with dullness." Id. at 195.

1. I agree with the view expressed in Chief Judge Hamley's dissent in Welsh v. United States, 404 F.2d 1078, 1088 (9th Cir. 1968), cert. granted, 396 U.S. 816, 90 S.Ct. 53, 24 L.Ed.2d 67 (1969):

> "While deferment on the ground of conscientious objection is a privilege, it cannot be granted or withheld on unconstitutional grounds. United States Seeger, 2 Cir., 326 F.2d 846, 851, affirmed on other grounds, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733. See also, Sherbert v. Verner, 374 U.S. 398, 404–405, 83 S.Ct. 1790, 10 L.Ed.2d 965, and note 6 and cases there cited; Baggett v. Bullitt, 377 U.S. 360, 380, 84 S.Ct. 1316, 12 L.Ed.2d 377; Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629. * * *."

A stronger argument could be made that the exemption was one that accommodated religion when the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918), was decided. At that time, the exemption was limited to members of religious sects opposed to war in any form. Today, when the exemption is granted to any who are willing to intimate that their views are religiously based, the argument that a distinction can be made to accommodate religion is seriously weakened.

159, 62 L.Ed. 349 (1918),[2] requires that we treat non-religious conscientious objectors differently from persons whose conscience and religion are closely intertwined. These cases were decided at a time when the exemption was limited to members of religious sects opposed to war in any form.[3] The United States Supreme Court appears to consider the question posed here to be an open one. It stated in United States v. Seeger, 380 U.S. 163, 173–174, 85 S.Ct. 850, 13 L.Ed. 2d 733 (1964):

> " * * * No party claims to be an atheist or attacks the statute on this ground. The question is not, therefore, one between theistic and atheistic beliefs. We do not deal with or intimate any decision on that situation in these cases. * * * "

Further evidence of its openmindedness on the issue is illustrated by the fact that it has taken certiorari in two cases in which the question is raised and an answer requested.[4]

2. For related cases, see Judge Blackmun's opinion, p. 451.

3. For a detailed discussion of the American History of the exemption, see, United States v. Seeger, 380 U.S. 163, 169–186, 85 S.Ct. 850, 13 L.Ed.2d 733 (1964).

4. Welsh v. United States, *supra*; United States v. Sisson, 297 F.Supp. 902 (D. Mass.), appeal granted, 396 U.S. 1035, 90 S.Ct. 679, 24 L.Ed.2d 65 (1969). The Supreme Court has not yet acted upon the application for certiorari in United States v. McQueary, 408 F.2d 493 (9th Cir. 1969), petition for certiorari filed No. 88 Misc.

5. The breadth of the objectors' beliefs in United States v. Seeger, *supra*, and in United States v. Levy, 419 F.2d 360 (8th Cir. 1969), has already been discussed in the preceding opinions of Judge Blackmun and Judge Lay. Other cases involving the broad scope of conscientious objection permitted include the following:

In United States v. Haughton, 413 F.2d 736 (9th Cir. 1969), the conscientious objector felt his beliefs were religious as he directed his life according to goals superior to a common existence. His personal beliefs included reverence for human life and living according to one's relative principles of good.

In my view then, we must either construe the statute as permitting all who sincerely object in conscience to bearing arms to be excused from the oath or hold that the statute is unconstitutional. I take the former course. See, United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

While it will be argued that such a construction of the statute is an unwarranted extension of *Seeger*, I cannot bring myself to believe that it really is.[5] A forthright recognition of sincere conscious belief as being within the purview of the Constitution and the statute is a necessary and honest approach which will avoid the necessity of "conscientious objectors consciously or unconsciously [dressing] up their convictions in [statutory] language * * * or using formulas that will minimize their troubles." Milton R. Konvitz, Religious Liberty and Conscience (Viking Press, 1968), p. 98.

*Seeger* and subsequent cases have in all but word given constitutional and

In Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir. 1969), the conscientious objector believed that the spirit of love constituted the "Supreme existence" and that men achieve a certain holiness "when we act in awareness of our brotherhood as men."

In United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4th Cir. 1969), the objector stated that he was a Humanist and that his beliefs were based upon "the principles of Goodness."

In Fleming v. United States, 344 F.2d 912 (10th Cir. 1965), the objector believed in a Supreme Being but based his objection to war upon the sanctity of human relationships.

In United States v. Shacter, 293 F. Supp. 1057 (D.Md.1968), the objector stated that the highest possible value must be placed on human life, that man's life is sacred, that mankind is a holy entity, and that the killing of man is a sin which no man can endure. He stated that his feelings were religious although he did not believe in God.

In United States v. St. Clair, 293 F. Supp. 337 (E.D.N.Y.1968), the objector stated that he was a pantheist, that his belief in a Supreme Being involved a duty to live according to his own conscience, and that his conscience prevented him from going to war.

statutory dignity to conscience. It is time we do so in fact. To take this step is not to relegate religious belief, to diminish its importance or to show hostility to it. The step additionally recognizes that "to protect religion fully, it is necessary to protect conscience." Konvitz, *supra*, p. 104.

The idea that non-religious conscience deserves protection is not a new one. Chief Justice Stone advocated it in 1919:

> "All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation in the hands of the State. * * *
>
> "While conscience is commonly associated with religious convictions, all experience teaches us that the supreme moral imperative which sometimes actuates men to choose one course of action in preference to another and to adhere to it at all costs may be dissociated from what is commonly recognized as religious experience." [6]

Others in our day have selected conscience for the highest position in the order of values:

> "First, the Nuremberg trials * * * established the principle in international law that the defense of having acted pursuant to orders of the government or a superior officer does not absolve a defendant from responsibility. * * *
>
> "[Second] * * * the Universal Declaration of Human Rights by the General Assembly of the United Nations. Article 1 provides that

> " 'All human beings are born free and equal in dignity and rights. *They are endowed with reason and conscience* and should act towards one another in a spirit of brotherhood.' [Emphasis included.]

> "Article 18 provides that 'Everyone has the right to freedom of thought, conscience and religion.' * * *
>
> · * * * * * *

> "The third development is the recognition of conscience by Vatican Council II.

> "In the Pastoral Constitution on the Church in the World (1965), the keynote is human dignity, which every man has in consequence of his creation 'in the image of God.' At the core of man made in the image of God is conscience. In the depth of his conscience man hears the voice of God, obedience to which is 'the very dignity of man.' It is, then, by virtue of his conscience that man is in the image of God. According to the way he obeys his conscience, he will be judged."

Konvitz, *supra*, pp. 99–101.

That it will be difficult to determine whether a person's objection to taking the oath is based on conscience is assumed, but the task cannot possibly be more difficult than ascertaining whether a conscientious objector's beliefs are religiously grounded. Besides, this country did recognize non-religious conscientious objectors during World War I for a time without apparent harm to the nation.[7] England has recognized such conscientious objectors for decades.[8]

---

6. Stone, The Conscientious Objector, 21 Colum.U.Qtly. 253, 263, 269 (1919). For contrary views, see, Russell, Development of Conscientious Objector Recognition in the United States, 20 Geo.Wash.L.Rev. 409, 416–417 (1952); Comment, 34 U. Chi.L.Rev. 79, 102 (1966).

7. Although the Draft Act of 1917 excepted religious objectors only, the Secretary of War in 1917 instructed that "personal scruples against war" be considered as constituting "conscientious objection." An order from the Adjutant General of the Army, dated December 19, 1917 (printed in Selective Service System

Monograph No. 11, Conscientious Objection, vol. 1, p. 54 (1950)) stated that: "The Secretary of War directs that until further instructions on the subject are issued 'personal scruples against war' should be considered as constituting 'conscientious objection' and such persons should be treated in the same manner as other 'conscientious objectors' under the instructions contained in confidential letter from this office dated October 10, 1917." A similar extension of the benefit of exemption from combatant service to non-

8. See note 8 on page 462.

462

It is argued that Congress clearly intended to exclude those from the exemption whose opposition to bearing arms was based on conscience, unless that conscience was the product of religious belief. While there is support in the legislative history of the statute to support this view, Congress has apparently been careful not to specifically exclude those who object in conscience from the benefits of the exemption. It has chosen instead to deny the exemption to those whose objection to serving is based on a merely personal code, a phrase less apt to irritate raw nerves than conscience. The only reference to conscience in the legislative hearings appears to be one which supports the view that all persons who object in conscience are entitled to the exemption:

> " 'The subcommittee realizes and respects the fact that the question of whether or not a person must bear arms in defense of his country may be one which *invades the province of religion and personal conscience.*' Thus, it recommended that an alien not be required to vow to bear arms when he asserted 'his opposition to participation in war in any form because of his personal religious training and belief.' S.Rep.No.1515, 81st Cong., 2d Sess., 742, 746." (Emphasis added.)

United States v. Seeger, *supra*, 380 U.S. at 180, n. 3, 85 S.Ct. at 861.

■ As I read this record, Mrs. Weitzman sustained the burden of proving, by clear and convincing evidence, that she is opposed to bearing arms as a matter of conscience. The trial judge found her to be completely sincere. She stated that her refusal to take the oath was based on conscience and personal moral conviction. She made it clear that she was opposed

to all killing of human beings under any circumstances. In the light of these expressions of conscientious belief, Mrs. Weitzman should be permitted to take the oath and become a citizen of the United States.

religious conscientious objectors was effected by President Wilson's Executive Order of March 20, 1918. That order directed assignment to noncombatant service for draftees who objected to participating in war because of "other conscientious scruples" as well as for those exempt under the Selective Service Act because of religious objections. U. S. War Office, Statement Concerning the Treatment of Conscientious Objectors in the Army (1919) 38-9.

8. National Services Act of 1948, 11 & 12 Geo. 6, c. 64, § 17. For a discussion of the British experience, see Sibley and Jacob. Conscription of Conscience (1952), pp. 4-7.