**In re Petition for Naturalization of Wiebke Klarita Helene THOMSEN.**

**No. TR–98.**

United States District Court, N. D. Georgia, Atlanta Division.

March 22, 1971.

---

3. Act Aug. 21, 1953, P.L. 1291 (12 P.S. Sec. 1584a).

David Carliner, Washington, D. C., Robert A. Blackwood, Atlanta, Ga., for petitioner.

R. William Foley, District Director, J. J. Middleton, Naturalization Examiner, Atlanta, Ga., for United States Naturalization & Immigration Dept.

## ORDER

MOYE, District Judge.

In a petition for naturalization filed by Wiebke Klarita Helene Thomsen, the Court is confronted with the issue of whether petitioner's refusal to take an oath obligating her "to bear arms on behalf of the United States" precludes her from satisfying the oath requirements of Section 337(a) of the Immigration and Nationality Act, the taking of which oath is requisite to citizenship by naturalization.

The petitioner, a native of Germany, was admitted to the United States as an immigrant on April 27, 1958. Since her

admission, she has been engaged in her profession, as a psychiatrist, in the United States. Dr. Thomsen first filed an application for naturalization on March 13, 1969, in the United States District Court for the Northern District of Texas. In this application, she indicated that, if required by law, she would not be willing "to bear arms on behalf of the United States." She further indicated, however, that she would be willing to perform noncombatant services in the Armed Forces of the United States and to perform work of national importance under civilian direction.

Dr. Thomsen, who now resides in Atlanta, Georgia, subsequently filed her application in this Court and was accorded a preliminary examination, on two occasions, before a duly designated examiner of the Immigration and Naturalization Service. During the course of these examinations, Dr. Thomsen testified, under oath, that she was unwilling to bear arms on behalf of the United States and submitted a prepared statement setting out the reasons for her position. The naturalization examiner recommended that the petition be granted, for reasons discussed hereafter, and the case is now before this Court. Be-

fore considering the testimony and prepared statement of Dr. Thomsen, and the recommendations of the examiner, however, the Court deems it necessary to examine the applicable law.

Section 337(a) of the Immigration and Nationality Act [1] requires persons seeking naturalization to take an oath inter alia, "to bear arms on behalf of the United States when required by the law." One may be exempted from taking this part of the oath, however, if he shows by "clear and convincing evidence" that he is opposed to bearing of arms by reason of "religious training and belief". The term "religious training and belief" is defined as "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." It is petitioner's contention that she is opposed to bearing arms by reason of "religious training and belief" as that term is statutorily defined and judicially construed.

In examining petitioner's contentions, the Court's attention has been directed to Section 6(j) of the Universal Military and Training and Service Act.[2] Before

---

1. 8 U.S.C. § 1448(a):

"A person who has petitioned for naturalization shall, in order to be and before being admitted to citizenship, take in open court an oath (1) to support the Constitution of the United States; (2) to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen; (3) to support and defend the Constitution and the laws of the United States against all enemies, foreign and domestic; (4) to bear true faith and allegiance to the same; and (5) (A) to bear arms on behalf of the United States when required by the law, or (B) to perform noncombatant service in the Armed Forces of the United States when required by the law, or (C) to perform work of national importance under civilian direction when required by the law. Any such person shall be required to take an oath containing the substance of clauses (1)—(5) of the preceding sentence, except that a person

who shows by clear and convincing evidence to the satisfaction of the naturalization court that he is opposed to the bearing of arms in the Armed Forces of the United States by reason of religious training and belief shall be required to take an oath containing the substance of clauses (1)—(4) and clauses (5) (B) and (5) (C) of this subsection, and a person who shows by clear and convincing evidence to the satisfaction of the naturalization court that he is opposed to any type of service in the Armed Forces of the United States by reason of religious training and belief shall be required to take an oath containing the substance of clauses (1)—(4) and clause (5) (C). The term 'religious training and belief' as used in this section shall mean an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code."

2. 50 U.S.C.App. § 456(j).

it was amended in 1967, this section contained the identical definition of "religious training and belief" as is found in the exemptive provisions of the Immigration and Nationality Act.[3] The judicial construction of this definition is of substantial significance, insofar as the administration of the draft laws is concerned, and petitioner argues that the interpretation given the definition in the draft context should be applied to the exemptive provisions of the Immigration and Nationality Act. Before deciding the question of applicability, the Court will examine two cases which have interpreted the pertinent section of the Military Training and Service Act.[4]

In United States v. Seeger,[5] the Court was faced with the interpretation of the "Supreme Being" language of Section 6(j) of the Military Training and Service Act, *supra*. The Court stated the precise issue to be as follows: "Does the term 'Supreme Being' as used in § 6(j) mean the orthodox God or the broader concept of a power or being, or a faith, to which all else is subordinate or upon which all else is ultimately dependent"?[6] In its resolution of this question, the Court proposed a test for exemption: "A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualify-

ing for the exemption comes within the statutory definition."[7]

The "parallelism" test adopted in *Seeger* was further articulated in the recent case of Welsh v. United States.[8] In *Welsh*, the Court further expanded the definition of "Supreme Being" in Section 6(j): "If an individual deeply and sincerely holds beliefs which are purely ethical or moral in source and content but which nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by * * * God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objector exemption under § 6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions."[9]

The *Seeger* and *Welsh* decisions obviously have added tremendously to the problems involved in the administration of the draft laws. It is precisely for that reason that the Court hesitates to give the *Seeger* (and *Welsh*) interpretation of "Supreme Being" blanket application to an entirely different statute, even though some of the statutory language involved is identical, without analysis.[10]

3. *Compare* 8 U.S.C. § 1448(a) *with* 50 U.S.C.App. § 456(j) (1958 ed.).

4. The Military Selective Service Act of 1967, 81 Stat. 104, changed the definition of "religious training and belief" by deleting the reference to "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation." The statute now merely states that "the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code." 50 U.S.C. App. § 456 (j). The pertinent section of the Immigration and Nationality Act has not been so amended. The amendment is of little relevance here, however, because in the cases discussed in the text, the Court construed the section as it read before

the 1967 amendment, that is, when the language was identical to that in the Immigration and Nationality Act. Moreover, it has been said that the 1967 amendment to the draft law did not affect the construction given the pertinent section in the cases discussed in the text. See In re Weitzman, 426 F.2d 439, 447 (8th Cir. 1970).

5. 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

6. *Id.* at 174, 85 S.Ct. at 858.

7. *Id.* at 176, 85 S.Ct. at 859.

8. 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed. 2d 308 (1970).

9. *Id.* at 340, 90 S.Ct. at 1796.

10. The naturalization examiner applied the construction given the definition of "re-

The present definition of "religious training and belief" in Section 337(a) of the Immigration and Nationality Act was incorporated into the statute in 1952. The legislative history of the 1952 Act indicates that Congress incorporated the definition with reference to the draft law: "The conferees have agreed to provide for a naturalization oath * * * which would not violate bona fide religious convictions if such convictions are properly proved to the naturalization court *in accordance with standards set up in the Selective Service Act* of 1948, as amended, and incorporated in this legislation." [11] This reference to the selective service laws in the legislative history of Section 337(a) of the Immigration and Nationality Act considerably lessens the Court's concern with the applicability of the *Seeger* construction to Section 337(a). The Court is further persuaded by the fact that the *Seeger* construction has heretofore been applied in naturalization petitions. For example, the naturalization court in the case of In re Weitzman [12] considered a naturalization petition of one who refused to take that part of the oath requiring her to bear arms or perform noncombatant service in the armed forces. In determining whether the petitioner should be exempted from that part of the oath, the Court noted that it would be "attentive to a recent interpretation of the analogous section in the Military Training and Service Act in the case of United States v. Seeger * * * ." [13] After examining the test elucidated in *Seeger,* the Court concluded that it was "necessary to analyze the Petitioner's beliefs as reflected by the evidence in the light of the *Seeger* decision." [14] On appeal,[15] a majority of the Ninth Circuit Court of Appeals also applied the *Seeger* construction of the "Supreme Being" language, although the lower court's final determination that the petitioner was not exempted was reversed.[16]

On the basis of the foregoing discussion,[17] the Court is of the opinion that the interpretation given the defini-

ligious training and belief" in *Seeger* and *Welsh* and recommended the petition be granted. The Assistant Commissioner of Naturalization takes the same position in a memorandum to the Deputy Regional Commissioner prepared in response to inquiry by this Court to determine whether the Department of Justice had arrived at a firm position on the precise question involved here. A copy of the Deputy Commissioner's memorandum which concludes "The Service regards the *Seeger* and *Welsh* cases as controlling in naturalization cases, and the 1967 amendment of the selective service laws as not having altered the rationale of those cases" is attached to this opinion as an exhibit.

11. Conference Report 2096, 82d Cong., 2d Sess., 1952, U.S.Code Cong. & Admin. News 1952, pp. 1653, 1756. (Emphasis Added.) For a detailed account of the legislative history relative to the naturalization oath, See In re Weitzman, 426 F.2d 439 (1970) (Opinion of Blackmun, Circuit Judge).

12. 284 F.Supp. 514 (Minn.1968).

13. *Id.* at 516 (Citation omitted.)

14. *Id.* The Court determined that the petitioner did not meet the parallelism test of *Seeger.*

15. 426 F.2d 439 (8th Cir. 1970).

16. In an exhaustive separate opinion, Judge Blackmun did not consider the construction of Section 337(a) of the Act since it was his determination that the petitioner had voluntarily abandoned this argument on appeal: "The appeal purports to rest solely on the asserted unconstitutionality, and not on any possible construction, of § 337(a) of the Immigration and Nationality Act * * *." 426 F.2d at 441. Judge Blackmun, referring to the *Seeger* construction in passing, in no way intimated that the application of the *Seeger* interpretation to § 337(a) would be incorrect.

17. The Court does not mean to suggest that *Weitzman* is the only case in which the *Seeger* construction has been applied in naturalization petitions. For example, see the unreported opinion in In re Nomland, filed January 30, 1968 (C.D. Cal.) where the Court held: "Petitioner's beliefs are religious within the meaning of that term as set out by the Supreme Court of the United States in United States v. Seeger * * * "

tion of "religious training and belief" in the *Seeger* (and *Welsh*) case must be applied to the exemptive provisions of the Immigration and Nationality Act. Having in mind the observation that things of the Spirit are better Spiritually discerned, this Court does not relish the task of categorizing "religious" beliefs or otherwise engaging in a dissection of human spiritual values. In deciding whether Dr. Thomsen's beliefs meet the parallelism test of *Seeger*, as refined in *Welsh*, however, this is precisely what the Court must, however reluctantly, now undertake.

As stated earlier, Dr. Thomsen refuses to take that part of the naturalization oath requiring her to "bear arms on behalf of the United States" although she is willing to take the modified oath obligating her to serve in the armed forces in a noncombatant role or to perform civilian work of national importance. At the outset, the Court notes the petitioner's observation that she could not imagine "any circumstances under which there might be a law that would require women over age 47, who are in addition physicians, to bear arms." R.6. Although the Court realizes the improbability of this prospect, petitioner's observation is not determinative of the issue before the Court since each pertinent part of the oath is prefaced in the hypothetical terms "when required by law." It is thus necessary to consider, as did the naturalization examiner, petitioner's reasons other than sex, age, or occupation upon which she bases her refusal.

In its struggle with this thicket of semantics, the Court's burden is in no way alleviated by Dr. Thomsen's apparent difficulty in clearly categorizing her particular beliefs. As the Court has heretofore taken note of the difficulty

of this endeavor, however, such shortcomings on the petitioner's part cannot be held against her.[18] Nor does the Court in any way doubt petitioner's sincerity in attempting to state her true beliefs.

Several statements of Dr. Thomsen have provided some assistance. When asked to articulate the basis for her beliefs, she stated they were "based more on the philosophy of life but not necessarily based on the existence of a supreme being." R.8. In further response to a similar question, she answered: "My idea that bearing arms and fighting wars should be abolished as soon as possible is not based on any particular political creed nor sociological theory nor on a particular religion. It is a conviction that has grown out of my own experiences during life, grown out of the writings of great people, including Christ's writings, and based on the idea that it remains to become more of a man being able to live with others * * * The physician especially, and certainly I cannot talk without thinking of my being a physician, is one who is there to serve life, not to destroy it under any circumstances. And the first creed that a doctor learns is, 'Primum non nocere,' 'First of all, do not harm' and that includes all areas of life." R. 9–10.

In her written statement, Dr. Thomsen said she "fully agree[s]" with the following statement: "[E]verybody except the avowed atheists (and they are comparatively few) believes in some kind of God * * * The proper question to ask, therefore, is not the futile one, Do you believe in God? but rather, What *kind* of God do you believe in?"[19] The author answers his question thusly: "Instead of positing a personal God,

18. The Court in *Seeger* noted: "Few would quarrel, we think, with the proposition that in no field of human endeavor has the tool of language proved so inadequate in the communication of ideas as it has in dealing with the fundamental questions of man's predicament in life, in death or in final judgment and retribution. This fact makes the task of discerning the intent of Congress in using the phrase 'Supreme Being' a complex one." 380 U.S. at 174, 85 S.Ct. at 858.

19. Muzzey, *Ethics as a Religion* (1951) 86–87.

whose existence man can neither prove nor disprove, the ethical concept is founded on human experience. It is anthropocentric, not theocentric. Religion, for all the various definitions that have been given of it, must surely mean the devotion of man to the highest ideal that he can conceive. And that ideal is a community of spirits in which the latent moral potentialities of men shall have been elicited by their reciprocal endeavors to cultivate the best in their fellow men. What ultimate reality is we do not know; but we have the faith that it expresses itself in the human world as the power which inspires in men moral purpose * * * Thus the 'God' that we love is not the figure on the great white throne, but the perfect pattern, evisioned by faith, of humanity as it should be, purged of the evil elements which retard its progress toward 'the knowledge, love, and practice of the right.' " [20] This credo is apparently adopted by Dr. Thomsen.

Dr. Thomsen's final statement should be noted: "In summary, my refusal to swear to bear arms on behalf of the United States is based on all I have learned, read, experienced (World War II), thought, and believed about this problem. It is the result of the best of my knowledge and the best of my conscience and judgment [sic], gathered around some basic faith that man can someday in the future overcome his insistence on the necessity and rightfulness to kill each other."

■ On the basis of Dr. Thomsen's testimony and written statement, the naturalization examiner found that "the petitioner's objection to bearing arms is not based upon her belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but, rather, petitioner's belief is purely ethical or moral in source and content but which nevertheless imposes upon her a duty in conscience to refrain from participating in any war at any time * * *" The examiner conclud-

ed that petitioner came within the parallelism test of *Seeger,* as refined in *Welsh,* and recommended that she be permitted to take the alternative oath as provided in Section 337(a). In light of the Supreme Court's decision in Welsh v. United States, *supra,* that beliefs "purely ethical or moral in source and content but which nevertheless impose upon [the holder] a duty of conscience to refrain from participating in any war at any time" fall within the scope of the *Seeger* test, the Court must affirm the conclusions of the naturalization examiner.

It is therefore ordered and adjudged that petitioner be allowed to take the alternative oath as provided in Section 337(a) and, upon her doing so, that her petition for naturalization be granted.